E-FILED
Tuesday, 04 August, 2020  11:45:58 PM
Clerk, U.S. District Court, ILCD

LAW OFFICES OF JOHN G. NOLTE
Maureen R. Graves (Illinois Bar #6311493)
1326 East Madison Park
Chicago, IL 60615
Phone: 949-466-4248
Fax: 949-856-0168

Attorney for the Plaintiffs

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| D.W., a minor, and S.W. and K.W., individually and as parents and next friends, <br><br> Plaintiffs, <br><br> v. <br><br> MAHOMET-SEYMOUR COMMUNITY SCHOOL DISTRICT NO 3, ILLINOIS STATE BOARD OF EDUCATION & CHRISTINE NORTHRUP, DIRECTOR OF SPECIAL EDUCATION FOR MAHOMET-SEYMOUR COMMUNITY SCHOOL DISTRICT NO. 3 <br><br> Defendants. | Case No. 2:20-cv-2226 <br><br> **COMPLAINT** <br><br> 20 U.S.C. § 1415(i)(3) <br> 29 U.S.C. § 794 <br> 42 U.S.C. § 1983 <br><br> JURY TRIAL DEMANDED <br> as to Rehabilitation Act Claim |

1.  D.W., a minor, and S.W. and K.W., individually and as parents and next friends of D.W.

(Plaintiffs), by and through undersigned counsel, state the following in their complaint against

Defendants, the Illinois State Board of Education, Mahomet-Seymour Community School

District No. 3 (District), and Christine Northrup, Director of Special Education for the District

(Defendants):

## INTRODUCTION

2.  D.W., a minor, and S.W. and K.W., individually and as parents and next friends of D.W. bring this action, which has three aspects: a request for reversal of a hearing officer's decision under the Individuals with Disabilities Education Improvement Act of 2004 (IDEA), 20 U.S.C. § 1415(i)(3), a plea for damages for disability-based discrimination pursuant to Section 504 of the Rehabilitation Act of 1974, 29 U.S.C. § 794, and a plea for damages against the District's special education director for violations of the Individuals with Disabilities Education Improvement Act (IDEA).

## JURISDICTION AND VENUE

3.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims for administrative review arise under the IDEA and its implementing regulations, 34 C.F.R. § 300.500 *et seq.*

4.  Venue is proper pursuant to 28 U.S.C. § 1391(b), because the parties reside in this judicial district and the events giving rise to the claim for relief occurred in this judicial district.

5.  Impartial Hearing Office Janet Maxwell-Wickett conducted written and telephonic proceedings in Illinois State Board of Education (ISBE) Case No. 2019-0081, culminating in refusal to hold a hearing regarding the family's challenge to D.W.'s goals, services and placement and dismissal of that request, on April 6, 2020. That order is attached hereto as Exhibit A. This is a timely challenge to that decision as it is being filed within 120 days of receipt of the decision. In addition, plaintiffs seek damages under Section 504 of the Rehabilitation Act of 1973, individual liability under the Individuals with Disabilities Education Act, and injunctive relief against the Illinois State Board of Education.

## PARTIES

6.   Plaintiffs, S.W. and K.W. are residents of Champaign County, Illinois, and are the adoptive parents and legal guardians of D.W., a minor.

7.   Defendant, Mahomet-Seymour Community School District No. 3 (District), headquartered in Mahomet, IL, is a public school district organized under and operating pursuant to the Illinois School Code (105 ILCS 5/1-1 *et seq.*). The Board of Education is the governing body of the District and is responsible for maintaining the schools within the District's jurisdiction, as well as the education of students in the District.

8.   Defendant, the Illinois State Board of Education (ISBE), headquartered in Springfield, Illinois, is an Illinois state agency responsible for the general oversight and administration of all public schools in the State of Illinois and for oversight of private schools with which districts contract for special education services. It is also the agency responsible for implementing IDEA in the State of Illinois and for providing legally compliant due process hearings and administrative records from such hearings.

9.   Defendant Christine Northrup is the Director of Special education for the Mahomet-Seymour Community School District No. 3 and has been responsible for decisionmaking regarding D.W.'s education since August 2019 when the current controversy begins (and long before).

## LEGAL BACKGROUND

10. Pursuant to IDEA and Federal Regulations, a free appropriate public education must be available to eligible students. 34 C.F.R. § 300.101.

11. With regard to educational placement decisions for eligible students, the placement decision must be made by a team of individuals who knows the students and in conformity with

the least restrictive environment provisions of IDEA. 34 C.F.R. § 300.116.

12. The least restrictive environment ("LRE") provisions of IDEA provide that to the maximum extent appropriate, children with disabilities be educated with their nondisabled peers. 34 C.F.R. § 300.114(a)(2)(i).

13. This provision further provides that "special classes, separate schooling, or other removal of children with disabilities from the regular education environment occurs only if the nature or severity of the disability is such that education in regular classes with supplementary aids and services cannot be achieved satisfactorily." 34 C.F.R. § 300.114(a)(2)(ii).

14. IDEA contains crucial procedural and substantial safeguards, including to have an IEP developed by the beginning of each school year, the right to annual or more frequent IEP reviews, and the right to have progress or lack thereof reviewed in detail at least every three years. 20 U.S.C. § 1414.

15. IDEA provides parents and students the right to a hearing before an impartial due process hearing officer when there is a dispute regarding a student's Individualized Education program. 20 U.S.C. § 1415.

16. IDEA provides "stay put" protections while disputes are pending, including the right of parents to insist on maintenance of a student's last agreed upon and implemented educational placement through the administrative and judicial process. 20 U.S.C. § 1415(j).

17. IDEA charges states with overseeing and ensuring adequate delivery of special education services. 20 U.S.C. § 1412.

## FACTUAL BACKGROUND

18. D.W., who is twelve years old, was adopted by his maternal great uncle and great aunt, and most recently attended school at his home school, Lincoln Trail Elementary School in

Mahomet, Illinois, where he is still a registered student but has not been allowed to attend school since January 24, 2019. This is the longest of a series of exclusions from school based on challenging behaviors which are seen only at school, and almost always in direct response to ill-advised adult behavioral interventions. A biracial African-American and white child, he lives with white parents and has attended overwhelmingly white schools. He is currently in the middle of what should be the summer between fifth and sixth grades, and despite qualifying for special education extended school year (summer) services each year, he is currently receiving no educational services with the exception of tutoring and counselling funded by his parents. The District insists that his current educational placement is Pavilion School, which will start August 19 and expects to provide a hybrid program (2 days at school and 3 days of remote instruction).

19. D.W. has mild cognitive neurobiological disorder, developmental coordination disorder, specific learning disabilities in reading and writing , ADHD combined type (inattention and hyperactivity), and unspecified anxiety disorder, and was prenatally exposed to alcohol and drugs.

20. D.W. is part of a loving family. He has friends from his community programs and neighborhood and has had no instances of physically aggressive behavior at home, in the community, or (with the exception of one encounter which seems to have been an accidental bump) with peers in school. He has never been psychiatrically hospitalized nor has he spent significant time away from his parents.

21. D.W. is eligible for special education services pursuant to IDEA and has an Individualized Education Program ("IEP").

22. D.W.'s educational history has been explained in detail in related cases. = Briefly, for several years, D.W.'s education has been the subject of intense conflict. He has often been

excluded from school for behavioral reasons, and has been frequently subjected to seclusions and restraint—many of them aimed at securing compliance rather than responding to behavioral emergencies. After losing two due process hearings, the District eventually convinced a hearing officer in March 2019 to permit a 45-day transfer to an interim alternative placement based on escalating behaviors between late November 2018, when the District-selected supervisor of his behavioral intervention program went on medical leave, and January 2019, when she refused to continue providing services at a public school site. Based on professional advice and their own experiences with D.W., his parents did not enroll him at Pavilion, the District-chosen 45-day site. Instead, they worked with him personally and obtained private services, in hopes of avoiding a placement that they and professionals serving him believed was far likelier to make matters worse than to make them better.

23. In summer 2019, D.W.'s family asked the District to revise D.W.'s annual IEP, which was due for review on August 14, 2019, seeking revision of goals that were initially developed in August 2017 and August 2018 and were defective then, and seeking consideration of current needs with respect to educational placement and services. At that time, D.W. had been out of school since January 24, 2019, as the District had unilaterally barred him from its premises while insisting that he needed residential placement or a separate day school which would be physically set up for regular use of seclusion and restraint, which the District was doing often by forcibly transporting D.W. to an unsuitable, improvised, isolated space—a process that caused minor physical injuries and far more significant social/emotional trauma.

24. Instead of offering to consider D.W.'s current educational needs, the District indicated that his placement had already been determined. In fact, the stay put placement in this case was that ordered by Mary Schwartz in 2018 DP 0088, a decision upheld by this Court in 2:18 cv

02146 CSB EIL, in a decision as to which the District is seeking Seventh Circuit review. IHO

Schwartz ordered a placement at D.W.'s home school with a noncontingent reinforcement

behavioral program and specialized academic remediation, both of which were recommended by

independent educational evaluators and adopted by IHO Schwartz.

25. The District convened an IEP meeting on October 30, 2019. While this was too late to

develop an IEP before school started, as required by law, and over a year since the last IEP at

which goals were meaningfully discussed, the District claimed that it was actually convening his

"annual" IEP meeting early, because it was designating the January 2019 meeting at which it

unilaterally excluded D.W. from school—before receiving a hearing officer decision allowing it

to do so—as his "annual" IEP.

26. At the October 30, 2019 IEP meeting, the District refused to initiate new assessments of

D.W. unless and until he entered a private, ostensibly therapeutic program, as recommended by

District staff.

27. At the October 30, 2019 IEP meeting, the family provided updated information about

D.W.'s academic levels and needs and social-emotional performance from his regular tutor and

from an independent educational evaluator. The District declined to incorporate this information

into his IEPs, or to revise present levels of performance, goals and objectives.

28. At the October 30, 2019 IEP meeting, the District special education director indicated

that no other placements would even be considered until D.W. "served" (District counsel's term)

a 45-day interim alternative placement.

29. The only aspect of D.W.'s program which the District was willing to revise was the

requirement in his behavior plan to use a previously litigated approach labelled "noncontingent

reinforcement." However, revisions were unclear, and allowed for continued frequent,

nonemergency use at Pavilion of the seclusion and restraint which had traumatized D.W. during his time in the District and had severely intensified his challenging behaviors. Indeed, a major argument for Pavilion by District staff in seeking the 45-day interim placement was that it was set up for hands-on interventions and seclusion rooms in a way that the District was not. Those approaches are counterproductive generally, as Illinois regulators are increasingly recognizing, and were for D.W.

30. The District's proposed setting, Pavilion, did not feature any Board Certified Behavior Analysts—professionals trained in reducing challenging behaviors and increasing desirable student behaviors--though students were sent there for challenging behaviors. Behavioral consequences were determined by aides and teachers pursuant to an arbitrary "levels" system. Aggression by students against peers was common; D.W.'s parents were very concerned about having him in an environment in which he was at risk of seeing, experiencing and possibly beginning to engage in aggression against peers—a tremendous escalation from his opposition to adult demands, most of which were hands-on and intrusive. The parents' own observations and those of experts persuaded them that Pavilion would be inappropriate academically, and likely disastrous behaviorally and emotionally. Mismatches between expectations and D.W.'s ability had long been a source of conflict with adults, and D.W. needed remediation as well as classroom accommodations and modifications. Systematic curricula were not apparent during family observations at the school. If D.W. had attended, an already crowded small room would have held approximately16 people. Students ate lunch in the room, the school did not have a playground, and the classroom was chaotic, with little if any learning going on, during their multiple tours of the facility. At the October 30, 2019 IEP meeting, staff did not appear to have any grasp of specific remediation techniques for students with learning disabilities—of the type

that the District had been ordered by IHO Schwartz to put in place for D.W.

31. At the October 30, 2019 IEP meeting, the District continued to insist on a separate day school placement, and refused to consider any potential alternative services, such as home- and community-based instruction, in order to ensure that D.W. would receive some educational services despite the conflict between the District, on one hand, and D.W., his family, and professionals outside the school system, on the other.

32. At the October 30, 2019 IEP meeting, the District made clear that its refusal to consider information about D.W.'s current academic needs, and its refusal to consider any placements other than that ordered based on behaviors nearly a year before, was based on its view that IHO Strusz's order was dispositive, though under appeal, and that it excused the District from meeting, or even assessing, D.W.'s needs until such time as he "served" the 45-day interim placement.

33. Following that IEP meeting, the family filed a hearing request on November 11, 2019, which was amended February 28, 2020, challenging D.W.'s education from August 16, 2019, the first day of the 2019-20 school year, to the date of filing, and noting that problems were ongoing.

34. When the District shifted to remote instruction due to Covid-19, D.W.'s parents attempted to obtain materials from the District for remote learning. The District made some but not all necessary materials available, but refused either to let D.W. participate in its on-line instruction or to fund on-line instruction by tutors who had been working successfully with him in person before the pandemic.

35. D.W.'s triennial assessment is due on August 10, 2020. His parents emailed the District special education director on June 17, 2020, requesting a domain meeting to plan D.W.'s triennial assessment. Instead of arranging a remote meeting, as districts have done throughout the

9

pandemic, on June 29, 2020, the District sent the parent an assessment plan, seeking consent, indicating that no new assessments were needed. Since D.W. has been out of school since January 24, 2019, and has been undertaking a limited course of academic instruction since then, he requires academic assessment. As the behaviors that were the basis for excluding him from school in January 24, 2019 have not been seen since then, and D.W. has matured and undergone counseling, his social-emotional status continues to require review. The District has expressed suspicion that D.W. has an undiagnosed mental illness and that invisible "private events" are causing challenging behaviors, but has taken no steps to assess whether these theories are correct and, if so, what educational implications they have. On July 10, 2020, K.W., D.W.'s mother, responded that D.W. did need assessment, and offered to make him available for remote or in-person assessment. The parents offered a brief delay since mediation was pending before the Seventh Circuit. Given that the case has yet to settle, D.W.'s parents emailed the superintendent on August 4 requesting an assessment planning "domain" meeting, or written notice as to why one would not be held.

36. The District is scheduled to reopen on August 19, 2020. It has asked parents whether they prefer hybrid, in-person, or completely on-line learning. K.W. has requested development of an IEP, but in the meantime has expressed a preference for on-line instruction. To date, the District has not responded.

37. Pavilion—the District's proposed separate day school—plans to have in-person instruction two days a week, which would involve students who engage in severe problem behaviors towards adults and each other as well as staff accustomed to involuntary transports, restraints and seclusion.

38. D.W. currently receives five hours of tutoring per week and an hour every other week of

counseling and occupational/sensory therapy, all provided by his parents without District assistance, through insurance and personal expenditures.

39. The District's position apparently continues to be that D.W. cannot access any District services until he "serves" a 45-day interim placement based on what it perceives as behavioral emergencies that occurred over 18 months ago.

40. Based on communications between the family and school staff, and between family and District counsel, it is not clear whether the District is willing to reassess D.W.'s needs absent an agreement by his family to put him into a setting which was physically and emotionally very risky pre-COVID, and is far more so now.

## COUNT I

### Administrative Review of the Hearing Officer's Decision

41. The Parents incorporates and restates Paragraphs 1 through 40 above, as though fully set forth herein.

42. In ISBE Case No. 2019 0081, the case as to which review is being sought in this action, the family challenged the District's refusal at the October 2019 IEP meeting to agree to assess D.W., to incorporate new information about his performance levels and needs, and to consider any alternatives to the 45-day interim alternative placement as to which it had obtained an order based on events at the end of 2018 and beginning of 2019. The family's hearing request noted that "[b]y now, the District has had far more than 45 days—indeed, it excluded [D.W.] over a year ago—to consider how it could educate [D.W.] appropriately and without placing him with students with far more severe and dangerous behaviors. It has had an opportunity to contemplate how it might improve matters at its sole elementary site, as well as opportunities to formulate out-of-the-box proposals which would combine 1:1 tutoring, in which [D.W.] has historically

done well, with social opportunities alongside nondisabled peers, in which he has also done well. The cycles of maladaptive behaviors of both [D.W.] and staff have been interrupted and are now in the distant past. Nothing in IHO Strusz's decision and order purported to excuse the District indefinitely from educating [D.W.] if, on professional advice, the parents did not accept, and instead appealed, the interim 45-day placement. Nor could she have done this, nor should ISBE disregard [D.W.]'s right to a current, meaningful IEP. Regardless of placement, [D.W.] needs more than a shell IEP based on obsolete information. One of his parents' concerns in placing him at Pavilion is that with the existing IEP, it would be extremely easy to pronounce the placement dramatically effective even if he made no gains at all."

43. The family's hearing request additionally pointed to specific deficits in the held-over IEP in the areas of reading, written language, math, social studies, science, speaking and listening abilities, and emotional and behavioral regulation. These were criticisms which had not previously been litigated, as to which the family had a right to hearing.

44. IHO Maxwell-Wickett refused to conduct a hearing regarding the parties' dispute over the 2019-20 school year, determining that placement was already dictated by the decision dated March 22, 2019, in Case No. 2019-DP-0199. That decision, by IHO Strusz, is on appeal in this court, in Case No. 19 C 2195, and has never been implemented. IHO Maxwell-Wickett determined that the "issue to be determined" was "[w]hether this Hearing Officer has jurisdiction to re-visit the Student's educational placement determination after same was determined by a prior Hearing Officer after the conclusion of an expedited hearing and when said determination is currently on appeal before the United States District Court for the Central District of Illinois."

45. Though IDEA calls for reevaluation of student needs on at least an annual basis, the IHO refused to consider evidence about D.W.'s current needs and presentation, or evidence about the

inadequacy of the program in which the District sought to place him in light of his current educational profile.

46. The IHO erred legally in determining that because D.W. was "not enrolled in an educational placement," the District had no obligation to assess him to determine his educational needs.

47. The IHO erred legally in determining that the District need not consider what placement would be appropriate as of the time of the IEP.

48. The IHO erred legally in determining that the District had no duty to update goals, objectives, accommodations, modifications and services, despite the passage of time and intervening changes in the student's skills and needs.

49. The IHO erred legally in rejecting plaintiffs' claim that the District had unlawfully predetermined placement at the October 30, 2019 IEP meeting, concluding incorrectly that "the IEP was controlled by IHO Strusz's prior Order with which Parents disagree." She did so even though that was a temporary, interim order based on what were deemed exigent circumstances, that did not take into account needs during the upcoming school year.

50. The IHO ignored the parents' point that even assuming *arguendo* that school placement was somehow fixed against the parents because an appeal was pending of the 45-day interim placement order, it was critical that D.W. return to school with updated information on academic levels, so that an appropriate level of work could be provided, fostering learning and reducing frustration.

51. The IHO's decision effectively strips D.W. of any rights under IDEA until he accesses a program that was ordered—for a 45-day interim period that has long since passed—based on behaviors that occurred from late November 2018 through January 23, 2019, during the part of

that period when school was in session.

52. The District could have sought to renew the 45-day interim placement, but did not, and under the IHO's decision, that "offer" could be reiterated in lieu of any duty to provide actual educational services, and that could go on indefinitely, whether or not justified by current circumstances.

53. The IHO's decision unlawfully placed D.W. in a worse position because of his parents' exercise of procedural rights; had he simply "served" the 45-day alternative placement, he might have been able to get out of it, into an appropriate, less restrictive environment for or during the 2019-20 school year. Under the IHO's ruling, he would have no educational placement at all, potentially for years, so long as his parents persisted in challenging the Pavilion 45-day-placement.

## COUNT II

### Violations of Section 504 of the Rehabilitation Act of 1973

### (Against Mahomet-Seymour Community School District No. 3)

54.  Plaintiffs incorporate and restate Paragraphs 1 through 53 above, as though fully set forth herein.

55. Section 504 requires that districts provide a free appropriate public education to school-age children, by meeting their needs as adequately as they meet the needs of students who are not disabled.

56. Section 504 bars retaliation based on disability advocacy.

57. Mahomet-Seymour is an excellent school district that provides outstanding education for nondisabled students. Since the beginning of the 2019-20 school year, most District students have attended school for full days and have benefitted from excellent academic instruction as

well as social, recreational and community building activities. They have received regular

performance feedback and assistance. The District has worked hard to prepare students for future

academic expectations and for the increasingly complex social world of adolescence.

58. Because of his disabilities and the District's counterproductive responses to them, D.W.

has been excluded from District programs since January 24, 2019.

59. Because D.W.'s parents have rejected District proposals for his education, the District

has refused to provide any services despite his clear need for services, in effect retaliating for

their advocacy. There are many ways that D.W. could receive public educational supports while

disagreements over his education are resolved; however, the District has opted to cut off supports

entirely.

60. The District's acts and omissions as described herein have denied D.W. meaningful, and

indeed any, access to the benefits of a public education. His right to publicly funded education

has been conditioned on acceptance by his parents of an unsuitable program which fails to

provide appropriate behavioral, emotional and academic supports and instruction for its students,

and would fail D.W., who would enter that program with an obsolete description of educational

levels and an IEP that disregards necessary academic remediation, as ordered by IHO Mary

Schwartz.

61. Though the District prides itself on excellent programs with high student success rates,

staff have demonstrated deliberate indifference, within the meaning of Section 504, to D.W.'s

needs and the District's legal obligations. The result is that his prospects for short-and long-term

educational success, success in adult roles, independence in activities of daily living, positive

interpersonal relationships, and short- and long-term personal satisfaction have been sharply

reduced and that his parents in the long-term are likely to experience significantly increased

financial burdens as a result of D.W.'s acts and omissions.

## COUNT III

## Violations of Individuals with Disabilities Education Act

## (Against Illinois State Board of Education)

62. Plaintiffs incorporate and restate Paragraphs 1 through 61 above, as though fully set forth herein.

63. ISBE has failed adequately to train and monitor hearing officers, allowing control over students' educations to be exercised by Janet Maxwell-Wickett, a hearing officer who regularly makes elementary mistakes of law in adjudicating special education disputes, including ignoring District responsibilities to carry on educational planning even when they are in conflict with parents.

64. ISBE has failed to ensure that school districts and the private programs with which they contract follow IDEA and provisions of Illinois law relating to the use of behavioral interventions, including without limitation seclusion and restraints, ignoring excessive use of restraints and seclusion by the District as well as by Pavilion.

65. ISBE has failed to ensure that private programs with which districts are authorized to contract to provide special education programs are capable of addressing all the disability-related needs of students, and has enabled a situation in which students are relegated for months and often years to programs in which academic instruction is put "on hold" in hopes of securing behavioral compliance with often arbitrary demands.

66. ISBE has failed to oversee whether special education services are provided in a racially just manner, and has enabled a system in which students of color are at severe risk of being subjected to disproportionate discipline in public schools and are at disproportionate risk of

having their educations outsourced to private contracts with low academic expectations and poor

behavioral and therapeutic services.

## COUNT IV

### Violations of Individuals with Disabilities Education Act

### 42 U.S.C. § 1983

### (Against Christine Northrup)

67. Plaintiffs incorporate and restate Paragraphs 1 through 66 above, as though fully set forth

herein.

68. The Seventh Circuit has indicated that individuals may be liable for violations of the

Individuals with Disabilities Education Act. *Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*,

783 F.3d 634= (7th Cir. 2015).

69. Christine Northrup unlawfully predetermined placement at the October 30, 2019 IEP

meeting, refusing to consider whether current circumstances required a separate school

placement, or whether any common ground could be reached so that D.W. could access some

services while the dispute among adults was adjudicated.

70. Though IDEA prioritizes parent involvement and requires school districts to consider

material provided by parents, Christine Northrup wrongly refused to consider an Independent

Educational Evaluation and other material presented by the parent in considering whether aspects

of D.W.'s IEP other than placement should be revised.

71. Though IDEA makes clear that services must be based on accurate understandings of

present levels of performance and disability-related needs, Christine Northrup wrongly refused to

reassess D.W.'s academic levels or educational needs, conditioning reassessment on acceptance

of an inappropriate and potentially very damaging educational placement.

72. Though IDEA presumes that professionals and parents will openly discuss student needs, Christine Northrup, along with legal counsel for the District chosen by or acceptable to her, dominated the October 30, 2019 IEP meeting to an extent that substantially limited participation by other District members of the IEP team, and rendered parent comments irrelevant.

### PLEA FOR RELIEF

73. Wherefore, Plaintiffs request that the Court provide the following relief:

    a.   Receive and review the records of the administrative proceedings (pleadings, motion practice and emails, as no hearing was held) from the Illinois State Board of Education;

    b.   Hear additional evidence from the plaintiffs as provided for in Section 1415(i)(C)(ii) of IDEA;

    c.   Reverse the Hearing Officer's decision and order;

    d.   Enter an order finding, based on the preponderance of the evidence, that the District violated D.W.'s right to have an IEP developed for the 2019-20 school year.

    e.   Grant relief requested in the due process request, which was for the following compensatory education remedies or reimbursement to the extent the parents managed to provide services unilaterally:

        i.   5 hours per day of academic tutoring for each day from August 16, 2019 through the date of decision to compensate for complete, unlawful denial of access to education during this period.

        ii.   $5,000 for curricular materials to support tutoring. This would allow for procurement of a sequential multisensory reading program as well as standard curricula and universal access/interventional components for

18

instruction in other subjects.

iii. $3,000 for parent and provider training in programs appropriate to meet D.W.'s needs, including behavior support systems and multisensory systems for reading instruction.

iv. Funding for compensatory related services in the areas of counselling, speech/language therapy and occupational therapy, in an amount subject to proof at hearing.

v. Funding for a complete Independent Educational Evaluation by providers chosen by the parents.

vi. Order that District convene IEP meeting immediately, and re-meet following IEE, to determine appropriate services in the least restrictive environment(s) appropriate to D.W.'s needs.

vii. Damages under Section 504 based on discrimination and retaliation, subject to proof.

f.   Award money damages against Christine Northrup for violations of IDEA.

g.   Order the Illinois State Board of Education to train hearing officers to the effect that ongoing assessment, IEP development and educational programming obligations are not suspended because parents reject a particular District proposal or because litigation is pending regarding a prior disagreement.

h.   Order the Illinois State Board of Education to train school districts and hearing officers regarding limits on the use of restraint and seclusion of students and regarding IEP development and oversight responsibilities with respect to students placed in separate day schools with populations of students who have emotional/behavioral

disabilities.

      i.   Award costs including attorneys' fees to plaintiffs in the event that they

become prevailing parties.

      j.   Other relief that the Court deems appropriate.

Respectfully submitted,

By:   /s/Maureen Graves
        Attorney for Parents